IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AUTOFORGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 02-1265 |
| | ) | |
| v. | ) | Judge McVerry |
| | ) | Magistrate Judge Caiazza |
| AMERICAN AXLE & | ) | |
| MANUFACTURING, INC. and | ) | |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the Defendants' Motions for Summary Judgment (Docs. 46 & 51) be granted in part and denied in part, as described below.

### II.   REPORT

#### BACKGROUND

The Plaintiff Autoforge, Inc. ("the Plaintiff" or "Autoforge") has filed this lawsuit based on its contractual dealings with the Defendants American Axle & Manufacturing, Inc. ("AAM") and General Motors Corporation ("GM" or "General Motors"). *See generally* Compl. (Doc. 1); *cf. also generally id.* at ¶¶ 2-4 (alleging facts establishing diversity jurisdiction). The Plaintiff was "in the business of manufacturing and fabricating metal parts for its customers," and AAM "manufactured and sold" to General Motors "vehicle steering and drive train

assemblies" for inclusion in GM vehicles.  *Id.* at ¶ 7; *see* GM's Stmt. of Facts (Doc. 48) at ¶¶ 5-6.  AAM, a company whose assets and operations formerly were owned by General Motors, worked with GM to "identify[] and select[] suppliers of materials and components" to be used in AAM's assemblies.  *See* GM's Stmt. of Facts at ¶ 7.  The Plaintiff was one of those suppliers.  *See id.* at ¶ 11.

These general matters aside, the factual background to this case is long and intensive.  The parties, being well acquainted with the facts, will not benefit from a lengthy recitation of the same.  Accordingly, the discussions below will be limited to the fundamental matters required to provide context to the parties' disputes.

At its core, this case involves two component parts that were to be manufactured by the Plaintiff:  "Splined Yoke Forging" Part Number 40006884 (identified herein as "the SYF" or "the SYF Part"); and the "Idler Arm Support" Part Number 26008788 ("the IAS" or "the IAS Part").  *See generally* Compl. at ¶¶ 15, 28.  The Plaintiff, who manufactured the predecessor part to the SYF, received from the Defendant(s) a purchase order regarding the IAS dated April 27, 1999.  *See* GM's Stmt. of Facts at ¶ 16.  A purchase order was issued regarding the SYF Part on December 20, 1999.  *See id.* at ¶ 17.

In terms of readying for production, the parties began working on both parts at around the same time. *Compare* Compl. at ¶ 15 (Plaintiff provided samples of SYF in August 1998) *with id.* at ¶¶ 33-34 (parties began considering proposed drawings for IAS in October 1998). As time progressed, however, the IAS Part took the lead in terms of actual manufacture. *Compare id.* at ¶ 43 (Plaintiff instructed to begin manufacturing IAS Part in September 1999) *with id.* at ¶ 23 (Plaintiff still seeking final approval of SYF design in March 2000).

As contemplated by the parties, the Plaintiff's production of the IAS required the company to "machine" the part, a process not previously undertaken by Autoforge. *See id.* at ¶¶ 38-39.[1] The Plaintiff thus was required to obtain two machining tools ("the Machines"), which were leased from a machine supplier. *See id.* at ¶ 40.

Problems arose in October 1999, when GM inspected the Plaintiff's machining process and concluded that another company, Mennie's Machine Company ("Mennie's"), was more capable of machining the IAS Part. *See generally id.* at ¶¶ 46, 48. The Plaintiff was instructed by GM, and thereafter did, transfer the Machines and related materials to Mennie's.

---

[1] "Machining . . . involves using a power-driven machine tool, such as a lathe or drill, to shape metal. Machining is a part of the manufacture of almost all metal products." *See generally* website at http://en.wikipedia.org/wiki/Machining.

-3-

*See id.* at ¶¶ 48, 50.  According to the Plaintiff, GM committed to "pay all costs incurred . . . in connection with Autoforge's acquisition of the Machines," the shipping of the Machines to Mennie's, and the remaining lease payments.  *See id.* at ¶ 49.

Prior to transferring the Machines, Autoforge had completed, machined and shipped to AAM approximately 22,500 IAS pieces. *See id.* at ¶ 52.  Thereafter, the Plaintiff continued to manufacture the IAS Parts (minus the machining) through September 2000.  *See id.* at ¶ 63.

During this time, the parties had yet to take all the necessary steps to begin production of the SYF line.  Issues also continued to arise regarding the IAS line from the perspectives of both parties.  *See generally, e.g., id.* at ¶¶ 60-61 (noting claims by AAM that Plaintiff was behind schedule in IAS production); *id.* at ¶¶ 53, 54, 56 (Plaintiff's claims for past-due sums based on work performed and expenses incurred).

The problems with the IAS line came to a head on more than one occasion:

- In February 2000, AAM advised the Plaintiff of an inventory shortfall regarding the IAS Part.  Both parties blamed the other but, according to the Plaintiff, AAM agreed to cover the costs of shipping additional parts on an expedited basis.  *See generally id.* at ¶ 61.

- In March 2000, AAM allegedly instructed the Plaintiff to cease production of the IAS Part. When AAM realized it did not have an alternate supplier for the part, the Plaintiff agreed to resume production in exchange for the Defendant's payment of outstanding charges. *See id.* at ¶¶ 57-58.

- In April 2000, a press used to manufacture the IAS Part experienced a major breakdown. AAM, who did not want to interrupt production, offered the use of its "Colfor manufacturing facility," allegedly free of charge to the Plaintiff. *See id.* at ¶ 62.

In September 2000, after the final IAS shipment had been made, the Plaintiff submitted to AAM invoice(s) detailing $211,617.69 in charges related to the IAS line. *See id.* at ¶ 65. In response, AAM issued a "Cost Recovery Notice" for nearly the same amount ($210,289.91), purporting to charge Autoforge for the expedited shipping costs and its use of the Colfor facility, as referenced above. *See id.* at ¶ 66; *see also* "Cost Notice Recovery" (attached as Ex. 65 to Doc. 50).

Then, in December 2000, the parties negotiated a settlement to resolve their outstanding issues. *Compare* Compl. at ¶ 68 (alleging same) *with* internal AAM emails dated Jan. 3-5, 2001 (attached under Ex. 57 to Doc. 60) (discussing AAM's "agree[ment]" and "negotiat[ion of a] final settlement" with Autoforge). According to the Plaintiff, the parties agreed that: (a) the Defendant's "cost recovery" would be reduced to $40,000, thereby entitling Autoforge to $171,617.69;

-5-

and (b) the Plaintiff would begin shipping the SYF Part in January 2001, consistent with other specified terms. *See generally* Compl. at ¶¶ 68-69; *see also* Ltr. of Autoforge's president dated Dec. 21, 2000 (attached as Ex. 56 to Doc. 60).

Thereafter, AAM made an untimely payment for less than the full amount agreed upon under the settlement. *See generally* Compl. at ¶ 71. AAM also informed the Plaintiff that it would not honor the SYF Parts agreement. *See id.* at ¶ 74. Through discovery, the Plaintiff has uncovered evidence that AAM was negotiating with and had selected another supplier for the SYF Part, Lake City Forge. *See generally* Pl.'s Stmt. of Facts (Doc. 59) at ¶¶ 52-78 (providing evidentiary support for allegations, including ones that AAM considered Lake City Forge to be source for SYF Part as early as September 1999 and that, in February 2000, said company was designated to provide 100% of AAM's SYF requirements). Autoforge also claims that GM failed to fully reimburse it for the acquisition, use and transfer of the Machines.

The Plaintiff brings claims against AAM for breach of contract, promissory estoppel, and fraud in the inducement. *See generally* Compl. at Counts I-IV *and* "Amendment to Complaint" (Doc. 14) (adding Count IX against AAM for fraud in inducement). The Plaintiff seeks to hold AAM liable for breaching the settlement agreement, for failing to make full payments regarding

the IAS line, and for abandoning Autoforge as the supplier of the
SYF line.  *See id.*

Claims are stated against GM for breach of contract,
promissory estoppel, and unjust enrichment.  *See generally* Compl.
at Counts IV-VIII.  Regarding breach of contract, the Plaintiff
cites GM's participation in the IAS and SYF contracts and its
alleged agreement to reimburse Autoforge for the Machines.
The Plaintiff also asserts promissory estoppel and unjust
enrichment in connection with the Machines.  *See id.*

The Defendants have submitted Motions for Summary Judgment,
which are now ripe for adjudication.

## ANALYSIS

Before reaching the merits of the Defendants' Motions,
the court quickly may resolve the outstanding choice of law
issues.  The parties are in agreement that Autoforge's breach of
contract claims should be decided under Michigan law.  *See* AAM's
Br. (Doc. 52) at 6; GM's Br. (Doc. 47) at 5-6; *and* Pl.'s Opp'n
Br. (Doc. 57) at 11.  Regarding the non-contractual claims, the
court need not decide whether Pennsylvania or Michigan law
applies because the result is the same under each.  *See*
discussions *infra*.

-7-

A.    <u>AAM's Motion for Summary Judgment</u>

    1.    <u>The Plaintiff's Breach of Contract Claims</u>

As to breach of contract, AAM relies heavily on the "boilerplate" provisions found on the back of its purchase orders regarding the IAS and SYF Parts (at times hereinafter, "the POs").  *See generally* AAM's Br. at 7-9.[2]  Among other things, the POs stated that:

    (a)    Autoforge's commencement of work "constitute[d its] acceptance of these terms and conditions only," and that different or additional terms were rejected by AAM, *see* POs (legible copy attached under Ex. 28 to Doc. 50) at ¶ 1;

    (b)    AAM "may at its option immediately terminate all or part of [the] order, at any time and for any reason," subject to giving written notice to the Plaintiff and the payment of specified sums, *see id.* at ¶ 13; and

    (c)    the PO "constitute[d] the entire agreement between the [parties] with respect to the matter contained [t]herein," it "supercede[d] all prior oral or written representations and agreements," and the "order may only be modified by a purchase order amendment/ alteration issued by" AAM.  *See id.* at ¶ 31.

AAM takes the position that these PO provisions governed each and every dealing between the parties as discussed in the instant case.  This proves too much.

---

[2]  The print on AAM's purchase orders is so fine that the court has been unable to verify, based on the copies submitted, whether the various provisions were consistent from PO to PO.  Upon inquiry, however, the parties have confirmed their agreement that the PO boilerplate provisions were, for all material purposes, identical.  *See* Ltr. to Court dated June 16, 2005 (contained in case file).

-8-

First is the matter of the settlement agreement between AAM and Autoforge.  The Defendant contends that the letter of Autoforge's president dated December 21, 2000 constituted merely a "unilateral attempt to modify the written contracts" reflected in the POs.  *See generally* AAM's Br. at 10.  Another way of looking at it, though, would be to view the letter as a memorialization of an entirely separate agreement to settle ongoing disputes that arose through performance of the sale of goods agreement.  And although the Defendant argues that Autoforge has failed to legally support this theory, the court is unaware of any contrary authority establishing that parties to a contract for the sale of goods are precluded from settling disagreements regarding the transaction through a separate compromise agreement.

Particularly damaging to the Defendant's position, moreover, is the clear evidence confirming AAM's understanding that a settlement had been reached.  As referenced above, an internal email was circulated at AAM identifying some of the very terms of settlement referenced in Autoforge's letter.  *Compare* Ltr. (noting reduction of IAS cost recovery to $40,000 and changing payment for SYF "to Net 10 days for a period of 6 months") *with* email dated Jan. 3, 2001 (*see* Ex. 57 to Doc. 60) (AAM manager's statements, "I negotiated the approx. $200,000 [cost recovery] down to $40,000" and "agreed to Net 10 payment for six months").

-9-

In sum, the Defendant has identified no basis for the entry of summary judgment regarding the Plaintiff's claims under the December 2000 settlement agreement.[3]  As a practical matter, Autoforge's reaching a jury on the settlement agreement arguably renders moot many of AAM's remaining breach of contract arguments, as the settlement agreement touched upon most of the Plaintiff's elements of damages.  *Compare* discussion *supra* (according to Plaintiff's letter, settlement addressed outstanding disputes regarding IAS line, as well as Autoforge's anticipated production of SYF line) *with* Complaint at ¶¶ 78-80 (claiming damages for unpaid IAS invoices, costs incurred in connection with SYF line, and lost earnings on same).

Nevertheless, the Defendant has raised additional contract issues and the court must address them.  Next is AAM's contention that Autoforge cannot recover on the outstanding IAS invoices.  *See generally* AAM's Br. at 13-15.  Although AAM's theory is less than fully transparent, the Defendant appears to argue it is entitled to set-offs, as a matter of law, that outbalance the

---

[3]  In light of AAM's admission to having entered the settlement agreement, the Defendant's attempted reliance on the statute of frauds is unavailing. *Compare* AAM's Reply Br. (Doc. 64) at 2 *with, e.g.,* Central Jersey Dodge Truck Ctr., Inc. v. Sightseer Corp., 608 F.2d 1106, 1114 (6th Cir. 1979) ("[an] agreement is not barred by the statute of frauds [where] the parties have admitted in word and deed their intention" to be bound by same) (citing and applying Michigan law); *cf. also generally* Lakeside Oakland Dev., L.C. v. H & J Beef Co., 644 N.W.2d 765, 770-71 (Mich. App. 2002) (equitable estoppel, which may be based on party admissions, "should be presented to the jury where factual issues exist regarding whether a party is estopped from raising the statute of frauds defense against a party who reasonably and justifiably relied on an oral agreement") (citations omitted).

sums requested by Autoforge. *See id.*

These arguments are misplaced in the summary judgment context. Regarding AAM's claimed entitlement to charge Autoforge for expedited shipping, the PO provision on which the Defendant relies contemplated "acts or omissions" by Autoforge "result[ing] in [its] failure to meet" shipping requirements. *See* POs at ¶ 4 (regarding "[P]remium [S]hipping"). There is a plain dispute of fact as to whose conduct caused the need for expedited delivery. *See* Pl.'s Opp'n Br. (Doc. 57) at 8-9 (attributing expedited shipping to AAM's ineffective inventory practices); AAM internal email dated Jan. 3, 2001 (characterizing AAM's loss recovery position as "not defendable in a court of law" because, among other things, expedited shipping costs were "[the] direct result of [AAM's] approximate inventory loss of 40,000 [pieces]"). There exist similar grounds to question the validity of the Defendant's charges regarding the Colfor facility. *See id.* ("Colfor's documentation of costs included full overhead burden and markup for . . . salaried exempt employees[, a]gain not defendable").

The undersigned also questions, in the first instance, the degree to which the POs may be read to govern AAM's claimed entitlement to set-offs. This was not a case where, at the time of the alleged incidents, the Defendant cited, relied upon and/or purported to proceed under the provisions of the POs. To the

-11-

contrary, AAM first raised the set-off issues <u>after</u> performance
under the IAS purchase order(s) had ended, and in response to
Autoforge's demand for payment.  *See generally* discussions *supra*
(noting that AAM claimed cost recovery in amount nearly identical
to payment requested by Autoforge).  At least with respect to
the Colfor facility, moreover, both parties were acting well
outside the bounds of the applicable PO(s); there was no
discussion in the written document of AAM loaning out a facility,
nor was appropriate compensation therefor discussed.[4]

The Defendant's entitlement to set-offs, if any, presents a
highly factual inquiry that cannot be ruled on as a matter of
law.  AAM therefore is not entitled to summary judgment in this
regard.

---

[4]   As seen below, the same types of issues arise within the context of GM and
the Machines.  *See* discussion *infra*.  Both Defendants here attempt to funnel
all of their dealings through the one sided micro-print on the back of AAM's
purchase orders.  Aside from failing for the reasons stated above and below,
the undersigned submits that this approach does not account for real-world
practicalities.  The facts alleged by the Plaintiff, if true, reflect the
parties having dealt with one another, "on the fly" and in real time, to reach
solutions allowing their livelihoods to continue.  These types of adjustments
should remain available, and it would not be reasonable to require Autoforge
at every turn to say, "wait, we have to check the fine print on the back of
the POs."  This is not the way business is conducted and, had Autoforge
adopted such a practice, its list of clients would have been short indeed.
In any event, the court should conclude that the POs cannot be read so broadly
under the law.  *Cf.* POs at ¶ 31 (PO "constitute[d] the entire agreement
between the [parties] <u>with respect to the matter contained [t]herein</u>")
(emphasis added).

Next are AAM's arguments regarding the termination of the SYF line. *Cf. generally* AAM's Br. at 15-16.[5]  Again the Defendant complains that the alleged promises identified by Autoforge were orally made. *See id.*  It also urges that the POs bestowed upon AAM the absolute right to terminate some or all of the part orders "at any time, for any reason." *See id.* at 16.

As referenced above, the Plaintiff avoids all of these issues based on the December 2000 settlement agreement. *See* discussion *supra* (noting that settlement included AAM's agreement to honor SYF production).  And while the Defendant may urge the factfinder to conclude that the settlement agreement did not include the SYF provisions,[6] AAM cannot deny that a settlement agreement was reached.  On this basis alone, the Plaintiff's SYF-related claims survive AAM's Motion for Summary Judgment.

As referenced in the Plaintiff's brief, moreover, the Defendant independently may be liable under the preexisting SYF

---

[5]  This discussion arises within the context of the Plaintiff's Count III, entitled "Breach of Contract [for] IAS Production." *See* Compl. at ¶¶ 94-99. Therein, Autoforge alleges that it continued production of the IAS Part only because the Defendant promised to honor the SYF production agreement. *See id.* In the undersigned's view, this begs the greater question of whether and how Autoforge may proceed to recover for AAM's failure to honor the SYF agreement. Irrespective of how the Plaintiff has set its claims to separate counts, this issue plainly is on the table based on a fair reading of the Complaint. *See generally, e.g.,* Compl. at ¶¶ 77, 79-80 (identifying damages based on AAM's failure to honor SYF line); *see also* discussion *infra* at n.7.

[6]  "When the terms of [an admitted oral] contract are contested, the actual terms of the contract are to be determined by the jury." Linsell v. Applied Handling, Inc., 266 Mich. App. 1, -- N.W.2d --, 2005 WL 292215, *5 (Feb. 8, 2005) (citation omitted).

-13-

agreement.  *Cf.* Pl.'s Opp'n Br. at 25-26 (arguing same).[7]  As the
Defendant itself admits, the PO regarding the SYF line stated
that Autoforge "agree[d] to sell" and AAM "agree[d] to purchase"
"100% of [AAM's] requirements" for the SYF Part.  *See* PO dated
Mar. 29, 2000 (attached as Ex. 53 to Doc. 50); *see also* AAM's Br.
at 15-16.  Under Michigan's version of the U.C.C.:

> [A requirements contract] is not too
> indefinite since it is held to mean the
> <u>actual good faith</u> . . . <u>requirements of the</u>
> <u>particular party</u>.  Nor does such a contract
> lack mutuality of obligation since . . . the
> party who will determine quantity is required
> to . . . conduct his business <u>in good faith</u>
> and <u>according to commercial standards of fair</u>
> <u>dealing in the trade</u> so that [its] . . .
> requirements will approximate a reasonably
> foreseeable figure.
>
> [For these reasons, p]laintiffs owe[] a
> contractual duty under [the] Michigan[] . . .
> UCC to execute . . . purchase orders in good
> faith and according to commercial standards
> of fair dealing in the trade. . . .
>
> If, <u>in bad faith</u> or <u>inconsistent with</u>
> <u>commercial standards of fair dealing</u>, <u>the</u>
> <u>[buyer] exercised a unilateral right not to</u>
> <u>purchase [the goods] or to terminate the</u>
> <u>purchase orders</u>, <u>[said buyer] would be</u>
> <u>subject to liability for breach of contract</u>.

---

[7]  Count III does not explicitly reference breach of the SYF agreement.
The Plaintiff identifies the issue in its summary judgment papers, however,
and such a claim likewise reasonably may be inferred from the pleadings.  *See*
Compl. at ¶ 95 (noting AAM "previously agreed" to SYF contract); *id.* at ¶¶ 24-
26 (discussing POs "obligat[ing]" AAM to buy SYF pieces); *and id.* at ¶ 74
(discussing AAM's decision "not . . . to honor its contract with Autoforge and
purchase the [SYF Part]"); *see also generally* <u>Swierkiewicz v. Sorema N.A.</u>,
534 U.S. 506, 512 (2002) (Federal Rules' "simplified notice pleading standard
relies on liberal discovery rules and <u>summary judgment motions</u> to define
disputed facts and issues and to dispose of unmeritorious claims") (citations
omitted, emphasis added).

General Mot. Corp. v. Paramount Metal Prods. Co., 90 F. Supp.2d
861, 873 (E.D. Mich. 2000) (citations and internal quotations
omitted, emphasis added); *accord* Plastech Eng'd Prods. v. Grand
Haven Plastics, Inc., 2005 WL 736519, *6-7 (Mich. App. Mar. 31,
2005) (citing, quoting, and applying Paramount Metal).

The Plaintiff easily reaches a jury on the claim that AAM
acted in bad faith and/or inconsistent with standards of fair
dealing.  *See generally* discussion *supra* (discussing Plaintiff's
evidence that AAM was double-dealing with Lake City Forge
regarding SYF Part).

### 2.   **Promissory Estoppel**[8]

As apparent from the analyses above, the Plaintiff reaches
a jury based on the alleged breach of three contracts:
the settlement agreement, the IAS agreement, and the SYF agreement.
*See generally* discussions *supra*.  The parties admit that
enforceable contracts existed in connection with the IAS and SYF
parts, thereby precluding claims for promissory estoppel

---

[8]   Some confusion has arisen based on the Plaintiff's mislabeling its
promissory estoppel claims as "equitable estoppel."  *See* Compl. at Counts IV,
VII; AAM's Br. at 16-17 & n.8 (addressing equitable estoppel, but
acknowledging that Plaintiff may have intended to plead promissory estoppel);
GM's Reply Br. (Doc. 63) at 10 (objecting to mislabeling of claim and alleging
prejudice).  The Plaintiff's equitable estoppel count makes repeated
references to detrimental reliance, however, which is another way of saying
promissory estoppel.  *See, e.g.,* Lehigh Valley Hosp. v. County of Montgomery,
768 A.2d 1197, 1200 (Pa. Commw. 2001) *and* Curto v. City of Harper Woods,
954 F.2d 1237, 1240 (6th Cir. 1992) (recognizing same under Pennsylvania and
Michigan law, respectively).  The liberal pleading standards support an
adjudication of the promissory estoppel claims, and no meaningful prejudice to
the Defendants has been shown.

regarding the same.  *See* <u>AGA Gas, Inc. v. Wohlert Corp.</u>,

2000 WL 1478466, *5 (W.D. Mich. Jul. 21, 2000) (under Michigan

law, "because promissory estoppel is an alternative theory of

recovery where no contract exists, an action based on an implied

contract theory will not lie [i]f the parties admit that a

contract exists") (citing and quoting numerous cases); <u>Reilly</u>

<u>Foam Corp. v. Rubbermaid Corp.</u>, 206 F. Supp.2d 643, 659 (E.D. Pa.

2002) (holding same under Pennsylvania law) (citations omitted).

As to the settlement, AAM has identified no basis for

denying the existence of an agreement to which its own agents

have plainly admitted.  *See* discussions *supra*.  Thus, there is

not reason to perpetuate the claims of promissory estoppel, and

summary judgment should be granted.[9]

### 3.   **Fraud in the Inducement**

In connection with this claim, the parties have stipulated

that Michigan law applies.  *Compare* Pl.'s Opp'n Br. at 30-31 *with*

AAM's Reply Br. at 1-2.  It seems fairly evident, moreover,

---

[9]  The undersigned remains confident that AAM's admissions to the settlement
agreement preclude, as a matter of law, its statute of frauds defense.
Assuming, however, that the issue is one for the jury (*see* <u>Lakeside Oakland</u>,
*supra* at n.3), Autoforge should be entitled to argue promissory estoppel in
the alternative.  *See* discussion *supra* in text (noting that promissory
estoppel claims are precluded only where parties admit to existing contract).
Contrary to Defense counsel's suggestion, such a claim would not be barred by
Michigan's economic loss doctrine or Pennsylvania's gist of the action test.
*See* <u>AGA Gas</u>, 2000 WL 1478466, at *3-4 ("Michigan law deems promissory estoppel
to be a <u>contractually based</u> cause of action") (emphasis added); <u>JK Roller</u>
<u>Architects, L.L.C. v. Tower Inv., Inc.</u>, 2003 WL 1848101, *1 (Pa. Comm. Pl.
Mar. 17, 2003) (Pennsylvania's gist of action doctrine "does not apply to
alternative causes of actions based upon implied or constructive contracts,
such as . . . claims for unjust enrichment and promissory estoppel").

that the Plaintiff pleads fraud in the inducement in an attempt
to evade Michigan's economic loss doctrine.  *Cf.* Pl.'s Opp'n Br.
at 31 ("fraud in the inducement is a well-recognized exception to
[Michigan's] E[conomic ]L[oss ]D[octrine]").  The Plaintiff's
claims cannot properly be viewed through this prism.

"Fraud in the inducement . . . addresses a situation where
the claim is that one party was tricked into contracting."
*See* <u>Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.</u>,
532 N.W.2d 541, 544-45 (Mich. App. 1995) (citations and internal
quotations omitted); *cf. also* Pl.'s Opp'n Br. at 32 (recognizing
<u>Huron Tool</u> as leading case regarding Michigan's fraud in
inducement exception).  Unsurprisingly, the claim must be based
on the Defendant's "pre-contractual conduct."  *See id.*
Accordingly, the Plaintiff's allegations of post-contractual
conduct cannot form the basis for a viable fraud in the
inducement claim.  *Compare id. with, e.g.,* Am. to Compl.
at ¶¶ 123.1-123.12 (alleging that various misrepresentations
induced Plaintiff to continue performing under existing
contracts).

Plaintiff's counsel is left to assert, then, that Autoforge
was induced into contract by AAM's misrepresentation it "intended
to purchase production parts from Autoforge," *i.e.*, to perform
its primary obligations under the contract.  *See* Pl.'s Opp'n Br.
at 32.  This argument runs afoul of another central tenet of

Michigan's fraud in the inducement exception, namely that the alleged fraud cannot be "interwoven with the breach of contract." *See* <u>Huron Tool</u>, 532 N.W.2d at 545 (citation omitted).  Here, the misrepresentation alleged could not relate more "to the breaching party's performance of the contract," and therefore it "do[es] not give rise to an independent cause of action in tort." *See id.* (citations and internal quotations omitted).

The Plaintiff's fraud in the inducement allegations are thinly veiled reassertions of its breach of contract claims. The Defendant's Motion for Summary Judgment should be granted.

**B.   <u>GM's Motion for Summary Judgment</u>**

At the onset, it is respectfully submitted that GM's potential liability should be informed by the analyses above regarding AAM.

GM obviously cannot be charged with breaching the settlement agreement between Autoforge and AAM, having not been a party to the same.  This leaves the contracts regarding the IAS Part, the SYF Part, and the allegations regarding the Machines.

**1.   <u>The IAS Contract</u>**

Although the Plaintiff purports to charge GM with breaching the IAS contract, a careful review of its pleadings reveals that its allegations are limited to the issue of the Machines.

*Compare* Compl. at ¶ 109 (claiming GM breached IAS contract "when AAM canceled its order . . . with GM's knowledge") *with id.* at ¶¶ 110.1-100.3 (stating claims for damages, all of which are related to Machines).  At trial, the various disputes between Autoforge and AAM regarding the IAS contract (*i.e.,* the unpaid invoices, purported set-offs, and alleged breach(es) of the settlement agreement) should not implicate GM.

### 2.  Breach of the SYF Contract[10]

The only conceivable claim against GM regarding this contract relates to the breach of good faith and fair dealing, referenced above.  *See generally* discussion *supra*.  Unlike AAM, however, there exist no theoretical or factual underpinnings in the Complaint for such a claim against GM.  Rather, the Plaintiff's breach of contract claims against this Defendant focus exclusively on the IAS contract and, more specifically, on GM's involvement with the Machines.  *See* Compl. at Counts V, VI. Notably, moreover, the Plaintiff neither argues on summary judgment that GM breached a duty of good faith or fair dealing,

---

[10]  Regarding the SYF Part, the Plaintiff's promissory estoppel claims against GM fail for the same reasons identified above regarding AAM.  *Compare* Compl. at Count IV (claiming detrimental reliance on GM's assurances SYF contract would be honored) *with* discussion *supra* (promissory estoppel claim precluded by parties' agreement that contract existed).

nor has Autoforge sought leave to amend.[11]

Accordingly, summary judgment should be entered in favor of GM in connection with the SYF contract.

### 3. <u>Claims Regarding the Machines</u>

As referenced above, GM posits that the parties' alleged agreement regarding the Machines is barred by the express terms of the purchase orders. *See* GM's Br. at 9. The provision upon which the Defendant relies, however, stated that the PO "constitute[d] the entire agreement between [the parties] <u>with respect to the matter contained herein</u>." *See id.* (quoting boilerplate PO provision, emphasis added). For the reasons stated above, the District Court should conclude that the alleged agreement regarding the Machines was <u>not</u> part of the "matter contained" within the purchase order(s). *See* discussion *supra* at n.4. Viewing the evidence in a light most favorable to the Plaintiff, both parties acted well outside the scope of the POs

---

[11] The only place Autoforge addresses GM's knowledge and/or involvement in AAM's decision to engage Lake City Forge is in its responses to GM's Statement of Material Facts. *See generally, e.g.*, Pl.'s Resp. to GM's Stmt. of Facts (Doc. 55) at ¶ 103 (stating GM was aware of AAM's discussions with Lake City Forge in August 1998). None of the Plaintiff's responses, however, would appear to rise to the level of permitting an assessment of liability against GM, as opposed to AAM. Even assuming the contrary, Autoforge has failed to allege claims that would support such a theory, to seek leave to amend, or to resist GM's request for summary judgment on this basis. *Compare* Pl.'s Br. in Opp'n to AAM's Mot. (Doc. 57) at 25-26 (arguing lack of good faith and fair dealing) *with* Br. in Opp'n to GM's Mot. (Doc. 58) (restricting SYF argument to promissory estoppel). It is too late in the day for Autoforge to make an opportunistic amendment, and the good faith and fair dealing claims should proceed only against AAM.

regarding the Machines, and GM's argument should be rejected.[12]

Also without merit is the Defendant's attempted invocation of the statute of frauds.  Honing in on the pleadings' reference to "indemnif[ication]," Defense counsel posits that the agreement regarding the Machines was "a promise to answer for the debt of another."  *See* GM's Br. at 12 (citing Michigan statute of frauds provision regarding indemnification).  This mis-characterizes the agreement described in the Complaint.  Although the Plaintiff does make passing reference to indemnification, its allegations reveal a broader and more traditional contract:  in exchange for GM's benefitting from the use of the Machines (through Mennie's), the Defendant promised to pay Autoforge's costs of acquiring, transferring and maintaining lawful possession of the Machines.  *See* discussion *supra*.  The Defendant's indemnification argument

---

[12]  The Defendant's parol evidence objections likewise fail because the agreement regarding the Machines was both separate from and subsequent to the contract memorialized in the PO.  *See generally* Missilmani v. City of Detroit, 2002 WL 740692, *2 (Mich. App. Apr. 23, 2002) (parol evidence rule bars "evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract," not evidence of subsequent agreements or conduct) (citation and internal quotations omitted, emphasis added), *appeal denied*, 655 N.W.2d 562 (Mich. Dec. 30, 2002) (table); 11 Williston on Contracts § 33:24 (4th ed. 2004) (parol evidence rule "does not exclude parol proof of a contemporaneous oral contract that is independent of, collateral to, and not inconsistent with, the written contract, even though it relates to the same general subject matter and grows out of the same transaction"); Krispin v. Foster, 2004 WL 226133, *6 (Mich. App. Feb. 5, 2004) (parol evidence rule "does not extend so far as to preclude the admission of extrinsic evidence to show . . . contemporaneous collateral parol agreements between the parties") (citation and internal quotations omitted).

is a red herring, and summary judgment is unwarranted.[13]

Finally, and within the context of the Machines only, GM has failed to demonstrate its entitlement to summary judgment on the Plaintiff's alternative theories of promissory estoppel and unjust enrichment. *See generally* GM's Br. at 13-20. As seen above: the terms of the purchase order(s) did not govern the separate promises regarding the Machines, *see* discussion *supra* at 20; the parol evidence rule is inapplicable, *see id.* at n.12; GM denies the existence of an express agreement, thereby allowing the Plaintiff to plead quasi-contractual theories in the alternative, *see id.* at n.9; and neither the gist of the action test nor the economic loss doctrine preclude these contract-based claims. *See id.*

GM is entitled to summary judgment on all of the Plaintiff's claims, save the ones regarding the Machines. Those claims should go to the jury, however, under the alternative theories identified above.

---

[13]  Nowhere in its moving papers does GM deny that, upon its request, Autoforge shipped the Machines to Mennie's. As noted above, moreover, the Complaint alleges that GM, not the Plaintiff, abandoned the parties' agreement to allow Autoforge to machine the IAS part. *See* Compl. at ¶¶ 46, 48. Reading the evidence in a light most favorable to Autoforge, and thus assuming the Defendant had insufficient grounds to change courses regarding the machining, GM's defense of these claims would appear particularly suspect.

**CONCLUSION**

The Defendants' Motions for Summary Judgment should be granted in part and denied in part, consistent with the analyses above.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this report and recommendation are due by July 25, 2005.  Responses to objections are due by August 5, 2005.


July 7, 2005

cc:

Dennis J. Kusturiss, Esq.
Mark T. Vuono, Esq.
Susan C. Indrisano, Esq.
Vuono & Gray
2310 Grant Building
Pittsburgh, PA  15219-2383

Paul W. Roman, Esq.
Steven W. Zoffer, Esq.
Joseph A. DiMenno, Esq.
Dickie, McCamey & Chilcote
Two PPG Place, Suite 400
Pittsburgh, PA  15222-5402

Mark A. Willard, Esq.
Thomas J. Sweeney, Esq.
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA  15219

Francis X. Caiazza
U.S. Magistrate Judge

-23-